Next case on the point docket is the case of in re Marriage of Robert Tuttle v. Mary Lou Tuttle. We have Mr. Kent Heller for the appellant and we have Mr. William Thomas for the absentee. Thank you. Please support counsel. The case before you is filled with problems, which if the trial court is affirmed, we'll have to deal with for a long time. The concept that a written document which disappears doesn't exist or doesn't apply, and I'm referring to the inductual agreement, is contrary to the law as it relates to any other kind of document. We deal with lost wills, we deal with lost documents, we deal with lost deeds, and there are procedures. I think the trial court erred in saying the statute requires that the document be written. It was written. Everybody acknowledges that. Who did that? An attorney for him or himself? Did an attorney do it for him? That's my understanding. They couldn't call him, get a copy of it? No one could find a copy of the agreement. That was the testimony. They didn't have it, either the man or the woman, nor the attorney. Correct. No one could find a copy of the agreement, both acknowledge that it was at one point written and sought. There wasn't any issue about that. The issue was that did it exist at the time. I think that the attorney would have had a copy with him and the file in his office. You would think, but of course the statute's rules allow destruction of files after what, seven years now? So it certainly could have been destroyed. This was a long marriage. And if the court had said we thought about the prenuptial agreement and it's unconscionable or there wasn't adequate disclosure, it would be a different story. But the court said it wasn't in writing and therefore not valid, and that's simply not correct. So the court could very easily reverse the trial court on this issue and say you have to reconsider this case based upon the prenuptial agreement and then, as Lincoln said, the world will little know or long remember what we've done here on this case. But the other areas that the trial court got into when she decided the property create a host of problems in terms of deciding other cases like this in that regard. For example, the pay down of the mortgage. If you have a mortgage on non-marital property and it's gone at the end of the marriage, then your spouse gets half the value of the mortgage. That's never been the case. The court wasn't even consistent when she considered the farmland that the parties owned that had been farmed by the corporation. She said, well, I'm going to impute $100 an acre as what this farm ground would have made, and I'm going to make the corporation in effect constructively pay that, even though during the course of the marriage they didn't. She imputed this income. When it related to the non-marital farmland, she didn't impute income, which would have been more than sufficient to pay the mortgage, just the inherent value of the ground. Are we now going to start valuing non-marital property not at what it's worth at the time of the dissolution, but what it's worth at the time the parties were married and then split the growth in the non-marital property? That's what this court has done. In addition, by adopting the methodology she's done, she's now saying that we're going to go back and look at every transaction in the marriage. We're going to try and determine whether or not the corporation paid the right rent. There's no evidence in this case that the wife objected to any of this. Counsel goes to great lengths to say what a scoundrel Mr. Tuttle is because he tries to avoid paying income tax. He even suggests that it's illegal or improper in terms of the methods that he's using. But Mrs. Tuttle benefited from that just as much as Mr. Tuttle did. These folks were married and the savings of tax to one was the savings to the other, and she seeks to reap the benefit by taking half of what this entire estate would be. So to then go back and impute income that wasn't paid and didn't exist means that the trial court in every divorce case is going to have to go back and question every single business transaction that occurs to see if one party or the other got an advantage and then impute income or equalize things up. It's no longer a question of what do the parties own as of the date of the dissolution, what part's marital and what part's non-marital. And that's what the statute at least contemplates. It doesn't contemplate going back and reconstructing the income of these parties for years and years and years. And I suggest to you that just because Wayne Howsham said it was so doesn't make it so. One of the things that Mr. Howsham said that stuck in my mind was these companies have to have been profitable. They had $10 million in sales, and with sales at that level, you have to be profitable. And I suggest that he look at the records of General Motors, Kodak, and others who made 10 times or 100 times what Mr. Tuttle was making and lost so much money that ultimately they filed for bankruptcy and hurt people all across the United States. There's no magic in the fact that there's $10 million in sales that says you have to be profitable, and there's no basis in terms of generally accepted accounting principles for that proposition at all. There's nothing that says there's a magic line somewhere that if you cross that line you will be profitable, and if you don't cross that line you won't. That type of speculation isn't supported by either the evidence or by any appreciable standard in terms of the accounting profession. Just because you become a CPA doesn't mean you become omnipotent. You don't become all-seeing and all-knowing, and he couldn't say just because of the level of sales that this company was profitable, just as he couldn't say that General Motors should have been profitable because they did $20 billion or $200 billion in sales. The question of payment of debt on a non-merrill asset with merrill funds is the argument that Mrs. Tuttle raised. The problem, of course, is that there's no evidence anywhere as to what it was that really was used to pay those mortgage payments. There's no evidence that money went into a joint account and came out or that the money from this non-merrill property simply went directly to the lender and paid these debts. And the question then becomes how much, if we're going to get into this kind of parsing, if you own a house and you get married, it's a non-merrill house, it's got a mortgage on it, if the wife makes one payment during a 25-year, does that transmute this property into merrill property? Does one payment do it? Does two payments do it? At what point in this process does this non-merrill asset, which is clearly non-merrill, become a merrill asset? And the approach which the court took, if that's affirmed, is going to make that a problem that we're going to have to deal with and won't get sorted out for years. Just like the suggestion that the court can award property from a trust to another party. A trust isn't even a party to the lawsuit. I don't know how you have jurisdiction to award trust property to another party without making them a party to the lawsuit, let alone the fact that it's absolutely uncontradicted that this trust was a piece of non-merrill property. We can go through each of these transactions and you can see where the methodology of the court went wrong. But again, if the court decides that the court should have made the ruling based upon the antinatural agreement, we don't have to deal with any of these issues. They all go by the wayside and have to reexamine the division of assets based upon the terms of that prenatural agreement. One final point I'd like to make, and that is that in their brief, the counsel for Mrs. Tuttle says over and over, you should affirm, you should affirm, the trial court didn't do anything wrong. But then they say, oh, by the way, the court made a $170,000 error, and we want you to award us at this court, at this level, an additional $170,000. The brief doesn't ask that you remand it for further proceedings. It asks that you amend the judgment and award $170,000. I pointed out in the reply brief, and I bring it up now, that the athlete did not file a cross-appeal. They did not raise that issue in the trial court, and it's my belief that issues such as that which are not raised in the trial court are waived, and it would not be appropriate for the court to grant that relief. Thank you. Thank you. Mr. Heller, you'll have the opportunity to resign. Thomas? Thank you, Congress, and Mr. Heller. I will start out, initially, about essentially what Mary Lou Tuttle has to represent to this court. This is representative of the brief, and I'm going to be brief in my representations to the court. The wife of Robert Tuttle, Colleen K., now high, returns from Texas to Crawford County. Robert helps her buy a house. At this point, the Robert and Mary Lou Tuttle marriage goes south. Before 2002, Robert and Mary Lou bought 585 acres of farm ground. They sold none. After Colleen K., high, comes back on the scene, Robert sold 485 acres of farm ground for no apparent reason. This will give the court a big overview of what was actually transpired, and there's this very clear case of dissipation. Now, Robert would have you believe that there was very clear evidence as to what this free marital agreement provided. Nobody could find it. Robert couldn't find it. Mary Lou couldn't find it, and apparently Robert's attorney, Bob Douglas, who prepared it, didn't have a copy either. There's no indication that Mary Lou Tuttle had an attorney when this free marital agreement was prepared. So the trial court had no document to look at. There was some testimony, some leading questions on cross-examination to Mary Lou about what was contained in the free marital agreement. But we're looking 30 years back. How is anybody going to remember the details? Yet Robert's asking the court to accept his interpretation of what that written document that he couldn't provide states, and that everything else should be thrown out the window because Robert says free marital agreement said X, Y, and Z. Well, he couldn't produce that agreement. Now, the agreement would have been entered, I assume, shortly after or around the time the parties got married in 1981. Before the Uniform Free Marital Agreement Act was adopted. But there still was case law interpreting free marital agreements before the Uniform Free Marital Agreement Act was adopted. I cite in my brief the Berger case, which cites the Warren case, which set forth certain criteria that the court would have to determine existed before they would even enforce any free marital agreement. And those criteria included whether or not the agreement was entered into with full knowledge without fraud, duress, or coercion. Other things, was the agreement fair and reasonable? Would the agreement cause one of the parties to live in an existence of penury if it could be enforced? There was no agreement for the trial court to look at, so the court couldn't make the determination of whether or not, by law, it was enforceable. So, the trial court wrote the rule that there was no written agreement presented. All the case law says the agreement has to be in writing. How can a court interpret a written document if the written document is sent from it? Now, another thing alleged in the argument of Mr. Tuttle is that the trial court erred in its valuation and disposition of property. Well, there was evidence to support the valuation that the trial court adopted. Mark Tuttle, after filing a petition of disposition of marriage, filed with his bank a financial statement indicating that he had $1.95 million net worth given to him. Now, remember, that's what he told the bank he had. That doesn't necessarily have to include everything he owned, just enough to support whatever borrowing he's going to undertake. Three years before that, Bob and Mary Lou Tuttle signed a financial statement saying they had $1.85 million. They both signed it, so you would think in a three-year period of time, perhaps there was an appreciation in the net worth of $100,000. The only evidence that was presented at trial as to the valuation of the business, which was given in its entirety in writing, was a testimony of Wayne Hodgson, who valued that business, the equipment selling business that the Tuttles engaged in, at $850,000. The court gave Mary Lou Tuttle, if she had the $850,000 together with either the $1,850,000 or the $1,950,000, a little less than one-third of the total assets of these parties that were accumulated over a 30-year marriage. Clearly, if anybody has a right to be unhappy with the trial court's decision, it's her. It's Mary Lou. Now, another issue is raised about the trust. Now, after Robert's ex-wife came on the scene, Robert took all the real estate and put it in this Robert Tuttle Revocable Trust. If you read the Robert Tuttle Revocable Trust, upon his death, it goes from Robert's descendants, Mary Lou gets nothing. Now, I've cited in the brief some cases that essentially hold for the proposition that to do such a thing is nothing more than an attempt to defraud Mary Lou out of her marital estate. The case law is clear on that. That's what he did. Another issue raised is whether or not there was dissipation. Now, after the divorce was pending, Robert took money that was accumulated during the marriage and bought a house for his wife in New England, Arizona. If that's not dissipation, I don't know what's dissipation. Also, we represent that taking the property acquired during the marriage, this 600 acres of farmland, and putting it in a trust, Robert Tuttle Revocable Trust, that would defraud Mary Lou out of her marital interest in this property, was also dissipation. We think it's very clear, and I'm not going to waste your time reiterating what I said in the brief. Now, Robert objects to the fact that the corporation farmed the ground that the parties owned. That corporation paid nothing to the parties for the rental of the ground. Now, if that corporation were to be a different entity, not controlled by Robert Tuttle, I would assume that Robert Tuttle and Mary Lou would have expected that corporation to pay them rent for the ground. Now, the trial court has written a testimony of Wayne Howsham, who put a very reasonable amount of money for a rental of $100 an acre at this point, and said that if the corporation acquired this money, Robert got the money from the corporation. He should give half of that to Mary Lou. That was the basis of what the court's reasoning, including what award Mary Lou should receive. The court would just as easily have said, gee, Robert Tuttle sold 485 acres of farm ground after his ex-wife came on the scene. Mary Lou Tuttle got nothing. At $2,000 an acre, that's $100 million, and she receives nothing. Finally, the appellate argues that the trial court abuses discretion in awarding Mary Lou maintenance. The trial court gave Mr. Tuttle the equipment selling business, as I said earlier, worth $850,000. The trial court gave Robert the farm ground. Robert got all of the income-generating assets, and Mary Lou Tuttle got no income-generating assets from this 30-year period. Clearly, it was not an abuse of discretion to order Robert to pay Mary Lou some maintenance for a finite period of time. The appellate has to point out that in my brief, I talked about Mary Lou Tuttle should have received this and should have received that from the trial court. I did not do a cross-appeal. I did do a cross-appeal because these people are approaching 80 years of age, needing some finality. But I did point out those factors to this court to point out that Robert got far in excess of what Mary Lou was from this 30-year period. And there was no abuse of discretion. Finally, I will state that in the case, in the Reid case, which is cited both in the reply brief and in the appellate's brief, that the court holds that trial courts accorded great deference in domestic matters. It makes its decision that after hearing all the testimony and assessing the weight of various factors, if, in finding of abuse of discretion, the appellate court will not overturn a fair and reasonable decision of the trial court on domestic matters. And I'm sorry, Your Honor, I can give you the Reid citation. It's 100 Illinois Appellate 3rd, 873. Mr. Thomas? Yes, ma'am. You did ask us to remand and with directions to award Mary Lou $170,000. Can we do that without a cross-appeal? No. Okay. All right. I was trying to point out to the court that Robert did not get shortchanged in this thing at all, and that I probably should have filed a cross-appeal. But in deference to my client and her desire to have this thing concluded, I didn't. Thank you. Thank you. Mr. Heller, do you have a vote? 315. I don't know how a cross-appeal would slow down these proceedings. It's my experience that they go at the same speed, whether there are two appeals or one. Just like Mr. Thomas has suggested to you, why would he sell farmland? And then he tells me these people are almost 80 years old. Maybe he's ready to stop farming. That would be one reason to sell farmland. That would also be a reason to be thinking about your estate plan to put your non-burial property in a trust to go to your kids. The fact that he sold 485 acres of land, are we going to second-guess all the 80-year-olds who start to sell their farmland or who do estate planning? Are we going to tell them that their estate plan is wrong or that they shouldn't have done it that way? Is that what we do? We go back and reanalyze this situation? Counsel suggests, well, the old wife moved back to Crawford County in 2002, so that must be the start of the breakdown of the marriage. There isn't anything in the record that supports that except his argument. The fact of the matter is these folks didn't separate until 2007, some five years later. The only reason they want to peg it back to that time is so that they can argue that the transactions that these 80-year-olds entered into, with no evidence of any objection of the other, are somehow dissipation of marital bonds. The fact that Mr. Tuttle sets up a trust for his children and his descendants and puts his assets in it is hardly sinister when you're almost 80 years old and, in fact, is probably something that more people should do to avoid the necessity of probating to save on federal estate taxes. So that suggestion is really an inadequate excuse to say why we should transmute this property. Counsel suggested to you that Mrs. Tuttle, poor Mrs. Tuttle, didn't get anything that earns money. She's got almost a million dollars in cash that earns money. I mean, and that's the point of the marriage. Why does someone who gets a million dollars in cash need money to get by from month to month? The legislature, when they passed this version of the Dissolution Act, said that the rationale should be that we want the separation of the parties, and that is that we'll award property so that people can get by without depending upon the other. She's got a million dollars. She doesn't need maintenance in order to get by for whatever years she has left as she approaches the age of 80. And finally, on the antinatural agreement, counsel suggests the case law enumerating the three reasons, the rationale that the court has to consider, and I suggest to you that it would have been all well and good had the court said I heard the testimony and the petitioner or respondent hasn't presented sufficient evidence for me to know what the agreement was, or if she just said I heard the evidence and there wasn't any evidence that she was well informed or knew what the assets were. But that isn't what the ruling in the trial court was. The ruling was if it's not in writing today, it doesn't meet the statute, and that's just clearly wrong. There is no question that at the time of the execution, this document was written. It did comply with the statute, and the court should not have summarily dismissed it and said it doesn't exist now, so it wasn't in writing. Mr. Heller, Bob Douglas' name was mentioned. Is it in the record, or how do we know there was an attorney identified to prepare the prenup? That's my understanding. Right. And Mr. Douglas has been around for a long time. Okay. Thank you both. Thank you, Mr. Heller and Mr. Thomas, for your arguments. It's been briefed. We'll take a matter of five minutes, and then we'll report.